United States District Court
Southern District of Texas
**ENTERED**
October 16, 2023
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| BLAKE ALLEN THAIN, | § | CIVIL ACTION NO |
| (TDCJ–CID  1102574) | § | 4:21-cv-01030 |
| Petitioner, | § | |
| | § | |
| | § | |
| vs. | § | JUDGE CHARLES ESKRIDGE |
| | § | |
| | § | |
| BOBBY LUMPKIN, | § | |
| Respondent. | § | |

## MEMORANDUM ON DISMISSAL

The statute of limitations bars the petition for a writ of *habeas corpus* brought by Petitioner Blake Allen Thain.

The motion to dismiss by Respondent Bobby Lumpkin is granted. Dkt 10.

### 1.  Background

In May 2002, a jury found Thain guilty of murder in Cause Number 879844 in the 185th Judicial District Court of Harris County, Texas. Dkt 11-1 at 197–98. The court sentenced him to prison for sixty-five years. Id at 197.

The First Court of Appeals affirmed his conviction on June 19, 2003. *Thain v State,* No. 01-02-00584-CR, 2003 WL 21404170 (Tex App Houston [1st Dist] 2003, pet refd).

The Texas Court of Criminal Appeals refused his petition for discretionary review on February 11, 2004. *In re Thain*, 2004 Tex Crim App Lexis 282.

Thain filed a state application for a writ of *habeas corpus* on May 10, 2005. Dkt 11-19 at 7. The Texas Court of Criminal Appeals dismissed it for noncompliance on August 9, 2006. Dkt 11-19 at 2.

Thain filed a second application on September 1, 2008, and the Texas Court of Criminal Appeals denied relief

without written order on findings of the trial court without a hearing on June 30, 2010. Dkt 11-20 at 2.

Thain filed a third application on September 24, 2018. The Texas Court of Criminal Appeals remanded the case to the trial court for development of the record, findings of fact, and conclusions of law. Dkt 11-31 at 1. Following the remand, the Texas Court of Criminal Appeals denied Thain's application without written order on the findings of the trial court without hearing and on the court's independent review of the record on November 25, 2020. Dkt 11-37 at 1.

Thain filed his federal petition in March 2021. He contends that his conviction is void because (i) the State violated his right to a fair and impartial trial by withholding exculpatory evidence, (ii) he is actually innocent, and (iii) the state court denied him due process by failing to hold an evidentiary hearing during his state *habeas* proceedings and by allowing his interrogatories to go unanswered. Dkt 1 at 6–7.

2.  Legal standard

The Anti-Terrorism and Effective Death Penalty Act of 1996 imposes a one-year statute of limitations for federal *habeas corpus* petitions. The statute provides in part:

> (1) A 1-year period of limitation shall apply to an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by

2

such State action;

    (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

    (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 USC § 2244(d)(1).

Most directly at issue here is § 2244(d)(1)(A), pertaining to limitations running from judgment finality at the conclusion of direct review. The Fifth Circuit explained in *Roberts v Cockrell* that "a decision becomes final by the conclusion of direct review or the expiration of the time for seeking such review." 319 F3d 690, 694 (5th Cir 2003) (cleaned up). Absent appeal to the state's highest court, judgment becomes final when the time for seeking such review expires. *Gonzalez v Thaler*, 565 US 134, 137 (2012) (cleaned up).

But even after a judgment becomes final in state proceedings, the limitations period under § 2244(d)(1)(A) doesn't proceed inexorably forward. AEDPA instead provides, "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 USC § 2244(d)(2). And so the clock that ticks onward pursuant to § 2244(d)(1)(A) is paused to the extent and during the time period to which § 2244(d)(2) applies.

Petitioners seeking a writ of *habeas corpus* pursuant to 28 USC § 2241 may also seek to toll the limitations period under § 2244(d)(1)(A) by invoking the doctrine of equitable tolling. This preserves claims in situations "when strict application of the statute of limitations would be

3

inequitable." *United States v Patterson*, 211 F3d 927, 930 (5th Cir 2000), quoting *Davis v Johnson*, 158 F3d 806, 810 (5th Cir 1998). And so, even if a petitioner can't pause AEDPA's statutory limitations period under § 2244(d)(2), he can seek to achieve the same result equitably.

      3.  Analysis

          a.  Limitations

Thain's conviction became final when the time expired for filing a petition for a writ of *certiorari*, being ninety days after the Texas Court of Criminal Appeals denied review. Supreme Court Rule 13.1 (West 2002).

The Texas Court of Criminal Appeals refused Thain's petition for discretionary review on February 11, 2004. Thain's deadline for filing a petition for a writ of *certiorari* was May 11, 2004. Thain thus had until May 11, 2005, to file his federal petition for a writ of *habeas corpus*. He waited until May of 2021 to do so. He did file three applications for state *habeas corpus* relief, but none had any tolling effect. The petition thus appears to be untimely under 28 USC § 2244(d)(1)(A).

Thain doesn't allege or demonstrate that any of the remaining alternate AEDPA triggers set a different end to the limitations period. As to § 2244(d)(1)(B), nothing in the record indicates that any unconstitutional action by the State imposed an impediment to Thain filing an application for federal *habeas corpus* relief before the end of the limitations period. As to § 2244(d)(1)(C), the claims by Thain don't concern a constitutional right recognized by the Supreme Court within the last year and made retroactive to cases on collateral review.

Thain does argue that his petition is timely under § 2244(d)(1)(D) because he didn't discover the results of atomic absorption tests until February 16, 2018. Dkt 1 at 11. He maintains that the prosecutor didn't disclose the results of those tests to trial counsel, that the results were favorable to his defense theory, and that they would have led to an acquittal. He also claims that he is actually innocent of the offense because he would have been

acquitted if the State had disclosed this evidence. Dkt 1 at 7–9; Dkt 3 at 9–18.

The record doesn't support any of these arguments. Thain raised these claims relating to the disclosure of the atomic absorption test results in his third state *habeas* application. Dkt 11-29 at 10–12. As exhibits, he attached the laboratory reports from the atomic absorption spectrophotometry tests conducted on his and two other suspects' hands. Dkt 11-29 at 76, Dkt 11-30 at 1–2. The reports, dated June 27, 2001, indicated the results of each of the tests were "inconclusive." Ibid.

The Texas Court of Criminal Appeals remanded to the trial court for development of the record. Dkt 11-31 at 1. Both trial counsel and the lead prosecutor for the State filed affidavits addressing whether the results of the atomic absorption spectrophotometry tests were disclosed to the defense and whether the results of the tests were favorable to Thain's case. Dkt 11-35 at 35–36.

Thain's trial counsel, James Leitner, testified as follows:

> I am currently an Assistant District Attorney for the Harris County District Attorney's Office. However, at the time of the applicant's 2002 trial I was a criminal defense attorney and my practice was solely devoted to that area of law. I have handled well over one thousand criminal cases in Harris County. Please find this as my response to the trial court's order for affidavit.

> With respect to whether I had access to the State's file during my representation of the applicant, I respond that I did. In 2002, the Harris County District Attorney's Office had an open file policy that allowed me to review the contents of the State's file. I was not allowed to make copies of the offense report or witness statements but I was able to make notes from the contents of the file including any reports. I no longer have my defense file in Mr. Thain's case.

5

With respect to whether I was aware prior to trial of the results of the atomic absorption spectrophotometry test performed on applicant, I respond that I have no specific recollection, however, from a review of the reporter's record and of the State's file I believe that I would have handled this at trial the way I did if I had known the results were inconclusive and the State failed to bring this evidence before the jury, or I didn't know of the results and thought the jury would be influenced by the State's failure to perform the test. To begin, I see that I filed a motion titled "Request for Brady Material" and I specifically requested for the results of any AA tests done. Therefore, a test result that would have helped me would have surely been brought forward by me at the trial. Test results that unquestionably hurt our cause would have caused me to avoid it like the plague. The fact of what I did on argument was my way of getting as much out of either situation. Therefore, I just don't remember whether I knew of inconclusive results or not. Additionally, I have read in the record where I argued that the State failed to produce the results of the analysis of the atomic absorption spectrophotometry tests at trial though there was much discussion about the applicant's hands – and two of his friends' hands – being bagged and swabbed. I see now that the laboratory report is dated June 27, 2001, and the applicant's trial began on April 29, 2002, and therefore the report existed for over 10 months prior to trial, and I believe that it probably is more likely that I knew of it and reviewed it prior to trial, but I am just not sure one way or the other.

With respect to why I chose not to introduce the results of the test or otherwise used the results of the test as part of the applicant's defense, I respond that again I have no specific recollection, however, from a review of the laboratory report, the results

of the test on the applicant's hands show to be inconclusive and therefore if I had access to the report, I likely did not think that introducing the results would have been as beneficial to the applicant's defense as arguing the way that I did. It should be noted the other two boy's hands also showed to have inconclusive results. In either event I took the strategic defensive strategy to argue that the State did not bother to do a complete investigation on a murder case. I have also found in my experience that calling a witness to testify as to inconclusive results sometimes allows the State to then obtain hurtful explanatory information on cross-examination as to why the results might be inconclusive. Indeed, the report itself lists out factors to be considered for interpretation of results, which I believe would only hurt or negatively impact the applicant's defense in comparison to the strategy that I took.

With respect to whether the applicant and I discussed the results of the atomic absorption spectrophotometry test during my representation, I respond that I have no specific recollection. If I knew then I am sure we discussed it, if I didn't know then we didn't discuss it. I believe that I would have discussed the report and the results contained therein with the applicant prior to trial had I known about it.

Dkt 11-35 at 41–43.

The lead prosecutor for Thain's criminal case, Tammy Jean Thomas, testified as follows:

My practice now consists primarily of criminal defense law. I was an Assistant District Attorney from 1990 through 2017. I have handled well over one thousand criminal cases in Harris County.

I was the Chief prosecutor in the District Court in 2002 and I handled the Blake Thain trial of the murder of Kaci Fink. The case was already pending

7

when I was transferred into the 185th District Court from a different assignment. I then handled the case through its conclusion where the applicant was convicted of murder and sentenced to sixty-five years in prison and a $10,000 fine by the jury.

In preparation for this affidavit I have reviewed portions of the reporter's record, reviewed the State's file, and spoke with the habeas prosecutor regarding the question as to whether the State disclosed certain evidence to the defense prior to the applicant's trial. Please find this as my response to the Court's inquiry.

With respect to whether the State failed to disclose before trial the results of the atomic absorption spectrophotometry test performed on applicant, I respond that the State had. It is my recollection that I provided Mr. Leitner with a copy of the laboratory report prior to trial. I know that the State's file was open and Mr. Leitner was free to review all materials within the file, including all of the laboratory reports. As previously mentioned, I have reviewed the State's file, and I have observed that the laboratory report that shows the applicant's atomic absorption spectrophotometry results is within the State's file, and not in any file that would have hindered Mr. Leitner from reviewing it. Additionally, a review of the reporter's record indicates that I discussed with several of the State's witnesses during trial, in the presence of the jury, that the applicant's hands – as well as other individuals' hands – were bagged for purposes of preserving potential atomic absorption spectrophotometry evidence. This is an indication to me that the fact and/or existence of the results of the laboratory report were known to the defense. My recollection is that I chose not to introduce the inconclusive results of the test because I did not believe it advanced the State's theory of the case and I would have preferred to

8

have been in the posture of cross-examining the results if the defense chose to present the results.

Dkt 11-35 at 45–46.

The trial court found both affidavits to be credible and the facts asserted therein to be true. Dkt 11-35 at 163, 177 (findings 8 & 23). And the trial court made the following relevant findings of fact:

> 11. The Court finds that the Harris County Medical Examiner's Office (Joseph A. Jachimczyk Forensic Center) performed analysis on the applicant's right and left hands on June 26, 2001, and the results were inconclusive as indicated by a laboratory report dated June 27, 2001. *See Applicant's Exhibit 4, Laboratory Report, p. 3.*

> 12. The Court finds that the laboratory report shows that the other males, Jay Mitchell and Clifton Cavins, whose hands were tested also showed to be inconclusive with respect to atomic absorption spectrophotometry. *See Applicant's Exhibit 4, Laboratory Report.*

> 13. The Court finds, based on the clerk's record, that Leitner filed a motion, "Request for "Brady" Materials" on July 3, 2001, which requested the trial court to order the State to disclose "for the results of any atomic absorption tests done to the hands of the defendant, or any other person who had access to the physical location of where the shooting occurred." (I C.R. at 12-15). Leitner also filed a "Motion for Discovery" that requested the trial court to order the State to produce "the results of all scientific tests conducted by a State agency or law enforcement agency concerning evidence studied in connection with the investigation or trial of the offense with which the Defendant is herein indicted." (I C.R. at 29-37). Neither order attached to the motions were signed by the trial court.

> 14. The trial court entered a discovery order on April 12, 2002 (I C.R. at 110[-]112). The discovery

order required the State to provide copies of all "laboratory reports of all examinations of contraband, fluids, hairs, fingerprints, blood samples, ballistics, soil, fibers, and paints" (I C.R. at 111).

15. The Court finds, based on a review of the reporter's record, that the State first presented evidence of what an atomic absorption test was through the testimony of Baytown Police Office[r] K.R. "Kenneth" Hampton (VI R.R. 8 through 11). Hampton testified that upon locating Cavins and Mitchell their hands were immediately bagged (VI RR 8-9). Hampton explained the purpose of bagging an individual's hands was to preserve potential evidence (VI R.R. at 11). Hampton also testified that he submitted the evidence to the ID office at Baytown Police Dept (VI R.R. At 11)[.]

16. The Court finds, based on the reporter's record, that the applicant's hands were bagged by Baytown Police Officers Chris Felder and Captain Jones (VI R.R. at 50-51, 116).

17. The Court finds, based on the reporter's record, that Baytown Police Officer George Drude swabbed the applicant's hands and performed the atomic absorption test (VI R.R. at 116).

18. The Court finds, based on the reporter's record, that Leitner cross examined Officer Drude as to his qualifications to perform the test (VI R.R. at 132-136).

19. The Court finds, based on the reporter's record, that the State presented evidence through Baytown Police Officer Kevin Davis that three atomic absorption kits pertaining to the applicant, Clifton Cavins, and James Mitchell, were taken from the Baytown Police Department property room to the Harris County Medical Examiner's Office on June 19, 2001 (VII R.R. at 133).

20. The Court finds, based on the reporter's record, that the Laboratory Report that shows the inconclusive atomic absorption test results for the applicant was never admitted at trial.

21. The Court finds, based on the reporter's record, that Leitner never objected to being unaware of the information contained within any laboratory reports or otherwise indicated that he was surprised by the State's presentation of evidence surrounding atomic absorption test collection procedures.

22. The Court finds, based on the reporter's record, that during the guilt portion of closing argument Leitner argued:

> There was no physical evidence in that car that puts Blake Thain in that car. There was – they told you we seized hair, they told you we seized fibers and from what you know, they didn't ever do anything with them. They told you that we did an atomic absorption test on Jay's hands and June's hands, which is a test to show you if somebody fired the gun to show you somebody was the short or not, and what did they do with those tests? Does it make sense they wouldn't run it? The problem is that when you make an assumption from the very beginning, before you do your examination and your investigation, that can spoil everything because you then do everything based on the assumptions. You only ask for tests to be done that support your assumptions. You don't ask for: Tell us about everything else you do if it doesn't support our assumption. But they let you know before they got to the phone booth, they had already made the assumption Jay and June weren't the shooters. Why even take those atomic absorption tests? Why

11

take them if you're not going to have them
analyzed? Why take blood from anybody...

(IX R.R. at 15-16).

23. The Court finds that Tammy J. Thomas
submitted an affidavit and that the affidavit is
credible and the facts asserted therein to be true.

24. The Court finds, based on the credible
affidavit of Thomas, that the State had disclosed
the results of the atomic absorption spectro-
photometry test performed on applicant to the
defense prior to trial. *See Affidavit of Tammy
Thomas, July 24, 2019.*

25. The Court finds, based on the credible
affidavit of Thomas, that it is Thomas' recollection
that she provided a copy of the laboratory report
at issue to Leitner prior to trial. *See Affidavit of
Tammy J. Thomas, July 24, 2019.*

26. The Court finds, based on Thomas'
affidavit, that the State's file was open to Leitner
and he was free to review all of the materials
within the file, including all of the laboratory
reports. *See Affidavit of Tammy J. Thomas, July
24, 2019.*

27. The Court finds, based on Thomas' affidavit,
that the lab report is contained in the State's file.
*See Affidavit of Tammy J. Thomas, July 24, 2019*[.]

28. The Court finds, based on the credible
affidavit of Leitner, that Leitner no longer has his
defense file in the applicant's case. *See Affidavit of
James M Leitner, July 1, 2019.*

28.[sic] The Court finds, based on the credible
affidavit of Leitner, that Leitner had access to the
State's file during his representation of the
applicant, and that Harris County District
Attorney's Office had an open file policy that
allowed Leitner to review the contents of the file.
*See Affidavit of James M. Leitner, July 1, 2019.*

29. The Court finds, based on Leitner's affidavit, that Leitner does not have a specific recollection as to whether he was aware prior to trial of the results of the atomic absorption spectrophotometry test performed on the applicant. *See Affidavit of James M. Leitner, July 1, 2019.*

30. The Court finds, based on Leitner's affidavit, that due to the report being dated on June 27, 2001, and the applicant's trial beginning on April 29, 2002, that it is more probable that he was aware of the report prior to trial. *See Affidavit of James M. Leitner, July 1, 2019.*

31. The Court finds, based on Leitner's affidavit, that Leitner does not have a specific recollection as to why he chose not to admit the laboratory report that showed inconclusive results for the atomic absorption spectrophotometry tests on the applicant's hands, as well as the other two males' hands. *See Affidavit of James M. Leitner, July 1, 2019.*

32. The Court finds, based on Leitner's affidavit, that Leitner likely did not think introducing the results would have been as beneficial to the applicant's defense as arguing the way that he did. *See Affidavit of James M. Leitner, July 1, 2019.*

33. The Court finds, base[d] on Leitner's affidavit he took the defensive strategy to argue the State did not bother to complete the investigation in the murder case. *See Affidavit of James M. Leitner, July 1, 2019*[.]

34. The Court finds, based on Leitner's affidavit, that Leitner has found in his experience that calling a witness to testify as to inconclusive results sometimes allows the State to then obtain hurtful explanatory information on cross-examination as to why the results might be

inconclusive. *See Affidavit of James M. Leitner, July 1, 2019.*

35. The Court finds that the laboratory report lists out factors to be considered for interpretation of results which could only hurt or impact the defense in comparison to the strategy taken. *See Affidavit of James M. Leitner*[,] *July 1, 2019*[.]

36. The Court finds, based on Leitner's affidavit, that Leitner does not have a specific recollection as to whether he and the applicant discussed the results of the atomic absorption spectrophotometry test. However, if Leitner was in-fact aware of the results then he is certain that he did discuss the results with the applicant, but if he was unaware of the results then a discussion was not had. *See Affidavit of James M. Leitner, July 1, 2019.*

33.[sic] The Court finds the State did not fail to disclose before trial the results of the atomic absorption test performed on applicant.

37. The Court finds that the applicant could have discovered the factual basis of his claim with the exercise of reasonable diligence before he filed his previous application in this cause. The laboratory report is dated June 27, 2001.

38. The Court finds, based on the reporter's record, that that the inconclusive results of the atomic absorption spectrophotometry tests are not material to the applicant's guilt or punishment.

CONCLUSIONS OF LAW

1. Applicant fails to show 1) the State failed to disclose evidence; 2) the evidence was favorable to the applicant; and 3) the evidence was material, such that there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the trial would have been different. *Ex parte Kimes*, 872 S.W.2d 700, 70203 (Tex. Crim. App. 1993).

14

The Texas Court of Criminal Appeals adopted the findings of the trial court on remand, conducted its own review of the record, and denied Thain's application without written order. Dkt 11-37 at 1.

The foregoing establishes, for purposes here, that the results of the atomic absorption tests about which Thain complains were made available to defense counsel prior to and during trial. The laboratory reports are dated June 27, 2001, and trial was conducted in April and May of 2002. See Dkt 11-2. Dkt 11-29 at 76, Dkt 11-30 at 1–2. Although the laboratory reports were not admitted as evidence at trial, several witnesses discussed the atomic absorption kits, the physical swabbing of Thain's hands, and the procedure by which the tests are conducted. Dkt 11-35 at 175–176. Defense counsel "never objected to being unaware of the information contained within any laboratory reports or otherwise indicated that he was surprised by the State's presentation of evidence surrounding atomic absorption test collection procedures." Id at 176 (Finding #21). For these reasons, Thain fails to show that the factual predicate of his claims could not have been discovered earlier through the exercise of due diligence.

As such, 28 USC § 2244(d)(1)(D) doesn't provide a later trigger date for the AEDPA's statute of limitations.

Absent equitable tolling, Thain's petition is beyond the applicable limitations period.

### b.   Equitable tolling

The Fifth Circuit holds that cases presenting "rare and exceptional circumstances" can equitably toll the one-year AEDPA statute of limitations. *Jackson v Davis*, 933 F3d 408, 410 (5th Cir 2019) (internal quotations omitted); see also *Holland v Florida*, 560 US 631, 649 (2010) (citations omitted). Equitable tolling applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights. *United States v Wheaten*, 826 F3d 843, 851 (5th Cir 2016) (citations omitted) (discussing equitable tolling in context of § 2255).

15

A petitioner seeking a writ of *habeas corpus* has to prove entitlement to equitable tolling. *Phillips v Donnelly*, 216 F3d 508, 511 (5th Cir 2000, *per curiam*) (collecting cases). To do this, he must show diligence in the pursuit of rights and extraordinary circumstances that prevented timely filing. *Manning v Epps*, 688 F3d 177, 183–84 (5th Cir 2012) (citations omitted). The required diligence is that which is reasonable, not that which is maximumly feasible. *Holland*, 560 US at 653 (quotation omitted).

Thain fails to show that any extraordinary circumstance prevented him from timely filing his federal petition. The record in no way suggests that the State of Texas misled him or otherwise prevented him from filing within the deadline.

The record also doesn't support a finding that Thain diligently pursued his rights as required to obtain equitable relief. His state application and this federal petition were filed *pro se*, but even construed generously, he let approximate gaps of almost fourteen years after his conviction became final on May 11, 2004, to file his third state *habeas* application raising the instant claims on September 24, 2018. That application was denied on November 25, 2020, and he waited an additional sixteen months before filing this federal petition in March 2021. Such delays counsel in the aggregate against the application of the equitable tolling doctrine. See *Ott v Johnson*, 192 F3d 510, 514 (5th Cir 1999). Indeed, the Fifth Circuit has found delays much shorter than those at issue here to preclude a finding of diligence. For example, see *Melancon v Kaylo*, 259 F3d 401, 408 (5th Cir 2001) (finding petitioner not entitled to equitable tolling after delay of four months).

c.   Actual innocence

A petitioner seeking *habeas corpus* relief may overcome the expiration of the AEDPA limitations period if the asserted claim qualifies under an exception to avoid a fundamental miscarriage of justice. *McQuiggin v Perkins*, 569 US 383, 392–94 (2013). A viable claim of *actual*

16

*innocence* serves as a gateway to bypass a procedural bar (such as the expiration of the statute of limitations) so that a constitutional claim may be heard. Id at 386, 392. But the standard is "demanding" and opens "only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" Id at 401, quoting *Schlup v Delo*, 513 US 298, 316 (1995); see also *Floyd v Vannoy*, 894 F3d 143, 154–55 (5th Cir 2018) (citations omitted).

*Actual innocence* in this context means "factual innocence, not mere legal insufficiency." *Bousley v United States*, 523 US 614, 623 (1998), citing *Sawyer v Whitley*, 505 US 333, 339 (1992); see also *Calderon v Thompson*, 523 US 538, 559 (1998), citing *Sawyer*, 505 US at 339. And a petitioner must support the allegations with new and reliable evidence that was not presented at trial, while establishing that it is "'more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *Fairman v Anderson*, 188 F3d 635, 644 (5th Cir 1999), quoting *Schlup*, 513 US at 327; accord *Finley v Johnson*, 243 F3d 215, 221 (5th Cir 2001); *United States v Jones*, 172 F3d 381, 384 (5th Cir 1999) (citation omitted).

The Fifth Circuit holds, "The *Schlup* standard 'does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that *no reasonable juror* would have found the defendant guilty.'" *Bosley v Cain*, 409 F3d 657, 664 (5th Cir 2005), quoting *Schlup*, 513 US at 329 (emphasis added). As noted, this standard is a demanding one.

Thain argues that the untimeliness of his petition is excused because newly discovered evidence shows that he's actually innocent of murder. This, too, relates to his contention that the atomic absorption test showed that he didn't fire the fatal bullets. Dkt 1 at 7.

17

The appellate court on direct review of Thain's conviction summarized the evidence at trial as follows:

> In October 2000, Crystal Davis was not doing well in school and was not getting along with her mother, so she decided to move in with her boyfriend's parents, Larry and Tanis Fink. The Finks had four children, including Crystal's boyfriend, Ross, his younger sister, Kaci, and two younger twin boys, Ryan and Neal. Kaci was 17-years-old and was a junior at Ross Sterling High School in Baytown.

> Crystal knew appellant from school. Sometime after midnight on June 14, 2001, Crystal was playing on the computer when she received an instant message from appellant. Appellant invited Crystal over for a drink. Although Kaci had never met appellant, Crystal asked him if she could bring Kaci along.

> It was approximately 2:00 a.m. when the girls climbed out of a window and drove Ross's car to appellant's house. Appellant met Crystal and Kaci outside his house. Crystal noticed a white Mercedes parked outside appellant's house. The three walked into appellant's living room where the two girls met two guys nicknamed Jay and June. Their names are James Mitchell and Clifton Davis, respectively. Appellant suggested they all go in his bedroom because his mother was asleep. Appellant's bedroom had bunk beds, two closets, two televisions, and many "Star Wars" figurines that were still in their packages and displayed on the wall. The wallpaper image on appellant's computer was a picture of appellant's face. Appellant's window had a large sign draped across the window that said "Lakewood pimp."

> Appellant gave the girls a bottle of hard lemonade to share. They watched cartoons, including a "Dragon Ball Z" video, and talked for

18

about an hour. They also listened to music from a group called "Stain."

Eventually, Crystal and Kaci got up to leave. Appellant was walking them out when he asked them to stop and he went back to his bedroom. After the girls had walked outside and said goodbye, appellant asked Crystal to come back to his room. Crystal, Jay, and appellant went back to his bedroom. When Jay left, appellant asked Crystal, "What's up with your friend Kaci?" Crystal replied, "Well, she thinks you're cute, but she's dating someone right now." As Crystal tried to open the bedroom door, appellant shut it and started kissing her. Crystal pushed on his chest and told him, "No, I have a boyfriend and, you know I don't want to do this." As Crystal turned to open the door again, appellant tapped on her shoulder and called her name. She turned around and saw that appellant was holding a silver handgun with a black handle.

Crystal got upset and said, "You're joking." Appellant replied, "Nope, this isn't a joke," and motioned for Crystal to get on the bed or the chairs. Crystal became more upset and said, "No, I'm not, I'm leaving, I'm leaving." Appellant told her to turn around and be quiet, but she opened the door and ran through the house to the backdoor. As she got near one of the cars, appellant caught her from behind, put his arms around her neck, and a gun to her head. Crystal fell and Kaci came up and pushed appellant off of Crystal. Both girls rushed to their car. As Kaci opened the door, appellant jumped in the backseat of the car and ordered the two girls to get inside and drive. Crystal did not see appellant's gun but she suspected that he might still have it with him.

Appellant ordered Crystal to turn on Mayhow Street but she refused because she knew that it led to a deserted area. Crystal continued driving

toward the Finks' house. Appellant told Crystal to take him back home. Crystal told him that she would drop him off at the end of Lakewood Drive, appellant's neighborhood entrance.

As Crystal approached Lakewood on Bayway, she saw Jay's white Mercedes coming out of appellant's neighborhood. Appellant told Crystal to flash the lights so that he could get into the Mercedes. Crystal flashed the car lights and started slowing down. Before Crystal had fully stopped, she heard the car door open and heard many gunshots coming from inside her car. Appellant exited the car through the passenger door and ran into a nearby open field toward the direction of his house.

Crystal got out of the car and managed to get a driver of a pickup truck to stop. The driver of an 18-wheeler also stopped at the scene. Crystal went back to check on Kaci and became hysterical when she saw Kaci covered in blood. The driver of the 18-wheeler called 9-1-1 and Kaci's parents.

Paramedic Sean Saunders, from the City of Baytown, arrived at the scene at 4:19 a.m. After he placed a heart monitor on Kaci's body, he found no sign of any electrical activity in her heart and concluded she was deceased. He noted that Kaci had injuries inconsistent with life and decided not to work on her any further.

Rene Hinojosa, from the Baytown Police Department, arrived on the scene sometime after 4:09 a.m. He saw Kaci sitting in the car and observed blood coming out of her ears, nose and mouth. He also noticed that the car was still running and that the driver's side window was shattered. Hinojosa saw Kaci's parents walking up to the car. When Kaci's father asked why the paramedics were not treating his daughter, Hinojosa told them that she was dead.

Kaci sustained several bullet wounds. One bullet entered the back of her left hand and exited near her index finger. Another one entered near her right ear, fracturing her skull, went through her brain, and exited through the center of her forehead. A third bullet entered on the right side of her back, piercing her right lung, causing trauma to the aorta, and exited through her upper chest. A fourth bullet, traveled through her right and left thighs respectively, exiting through her left calf.

Five .380 caliber shell casings were found outside of the car and another one was discovered inside on the center console. Two fired bullets were found among the broken glass in the driver's seat. Other bullets were recovered from the floorboard and from the driver's side door.

Chris Felder, from the Baytown Police Department, went to appellant's home along with some other officers, including George Drude. Drude called appellant's phone but there was no answer. About 30 minutes later, Drude called appellant and he answered. Drude identified himself and asked appellant to step outside, but appellant refused, and wanted to know the charges. Drude told appellant that the house was surrounded, but appellant responded "he didn't feel like getting up right now, that he would call back ... when he got ready to ... Y'all can wait out there. Y'all are on overtime." Drude called appellant again, and appellant stated, "I know y'all are after me for something. So y'all can wait until I get up. Y'all are on overtime." This continued for three hours until appellant eventually came out of his house and was arrested.

Appellant's house was searched the next day. Inside appellant's bedroom was a gun range target and a gun rack. There was a box of shell casings, including .38 caliber, .380 caliber, and .22 caliber shells, and a holster in appellant's closet. A

"Dragon Ball Z" video was found in the VCR, and a compact disk of the group "Stain" was found on top of the videotapes. There were four bottles of Boone's Hard Lemonade recovered from appellant's bedroom; however, there were no usable fingerprints on the bottles. The fired shell casings found in appellant's bedroom and the fired shell casings found at the murder scene were all fired from the same gun.

*Thain v State,* No. 01-02-00584-CR, 2003 WL 21404170, *1–5 (Tex App Houston [1st Dist] 2003, pet refd).

Thain now argues that the atomic absorption test clearly demonstrates that he didn't fire the fatal bullet that killed Kaci Fink. There are several problems with this line of argument.

The most pertinent problem is the timing of the atomic absorption test—and Thain's knowledge of it. The test was conducted on June 27, 2001 (approximately two weeks after the subject murder), with the lab report dated the next day. Thain's trial began on April 29, 2002. But he now states that he learned of the results of the atomic absorption test only in February 2018, in response to a Public Information Request to the Harris County Institute of Forensic Science.

To the contrary, the state court on review determined factually that the prosecution's file was open to the defense, and that it hadn't failed to disclose the test report. And defense counsel has acknowledged, as noted above, that the report existed for over ten months prior to trial. Defense counsel further explained that from a review of the laboratory report, the results of the test on Thain's hands were shown to be inconclusive—and thus if he had access to the report (on which point he couldn't recall one way or the other), he didn't think that introducing the results would have been beneficial to Thain's defense. Instead, the record reflects that counsel chose to point out that Thain's hands had been bagged and swabbed, and that the State failed to produce the results of the analysis of the atomic

absorption spectrophotometry tests at trial—suggesting that the prosecution didn't do a complete investigation on a murder case.

Thain's argument thus falls far short of meeting "the threshold requirement" of a viable claim of *actual innocence* allowing bypass of an otherwise applicable procedural bar. *McQuiggin*, 569 US at 386; see also *Schlup*, 513 US at 324 (*actual innocence* claim must be supported by "new reliable evidence" of an "exculpatory" nature); *Fairman v Anderson*, 188 F3d 635, 644 (5th Cir 1999) (same).

But more, Thain's delay in presenting his assertion itself renders it untenable. The Supreme Court holds that the untimeliness of a petition itself bears "on the credibility of evidence proffered to show actual innocence." *McQuiggin*, 569 US at 401. Any unexplained delays in presenting supposed new evidence is highly relevant in determining whether a petitioner has shown actual innocence. Id at 399. And it's equally clear that evidence "does not qualify as 'new' under the *Schlup* actual-innocence standard if 'it was always within the reach of [petitioner's] personal knowledge or reasonable investigation.'" *Hancock*, 906 F3d at 389, quoting *Moore v Quarterman*, 534 F3d 454, 465 (5th Cir 2008) (alteration in original).

The foregoing indicates that all of the facts that Thain purports to know now were of necessity equally known to him (and his counsel) at the time that he was found guilty of murder in May 2002. But he waited over sixteen years after his conviction to bring these facts to the attention of the courts. Given that delay in bringing forward this putative evidence, it simply can't be said that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *McQuiggin*, 569 US at 399.

The claim of actual innocence by Thain doesn't make his petition timely. His petition will thus be dismissed as untimely.

4.   Motion for evidentiary hearing

Thain seeks an evidentiary hearing as to his challenge to his conviction and sentence. See Dkt 3 at 18.

Rule 8 of the Rules Governing Section 2254 Cases states, "If it appears that an evidentiary hearing is not required, the judge shall make such disposition of the petition as justice shall require." The reviewing court thus has discretion to reject the need for an evidentiary hearing. See *Conner v Quarterman*, 477 F3d 287, 293 (5th Cir 2007), citing *Roberts v Dretke*, 381 F3d 491, 497 (5th Cir 2004). Indeed, AEDPA reflects a congressional intent "to avoid unneeded evidentiary hearings" in federal *habeas corpus* proceedings. *Williams v Taylor*, 529 US 420, 436 (2000). Section 2254(e)(2) of Title 28 thus provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

A federal *habeas corpus* petitioner can have an evidentiary hearing if a genuine factual dispute exists and the state hasn't afforded a full and fair hearing. *Clark v Johnson*, 202 F3d 760, 766 (5th Cir 2000), quoting *Perillo v Johnson*, 79 F3d 441, 444 (5th Cir 1996). But a petitioner

isn't entitled to a federal evidentiary hearing "if his claims are merely 'conclusory allegations unsupported by specifics' or 'contentions that in the face of the record are wholly incredible.'" *Young v Herring*, 938 F2d 543, 560 (5th Cir 1991), quoting *Blackledge v Allison*, 431 US 63, 74 (1977); see also *Washington v Davis*, 715 F Appx 380, 385 (5th Cir 2017, *per curiam*).

Thain presents nothing but conclusory assertions that he is illegally confined due to prosecutorial misconduct and denial of due process by the state *habeas* court. Dkt 12. An evidentiary hearing isn't necessary where nothing establishes a pertinent factual dispute requiring development in order to assess the claims. *Robison v Johnson*, 151 F3d 256, 268 (5th Cir 1998) (internal quotations omitted). To the contrary, all issues raised in this case can be and have been resolved based on the pleadings.

The motion for evidentiary hearing will be denied. Dkt 3.

### 5. Certificate of appealability

Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse to the petitioner. A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right." 28 USC § 2253(c)(2). This requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v McDaniel*, 529 US 473, 484 (2000) (citation omitted). Where the court denies relief based on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," and that they "would find it debatable whether the district court was correct in its procedural ruling." Ibid.

The Court finds that jurists of reason wouldn't debate whether any procedural ruling in this case was correct. As

such, Thain hasn't made the necessary showing to obtain a certificate of appealability.

A certificate of appealability will be denied.

6.   Conclusion

The pleadings and state court records show that the federal petition for a writ of *habeas corpus* brought by Petitioner Blake Allen Thain is untimely.

The motion to dismiss by Respondent Bobby Lumpkin based on limitations is GRANTED. Dkt 10.

The petition is DENIED. Dkt 1.

A certificate of appealability is DENIED.

The motion for evidentiary hearing filed by Thain is DENIED. Dkt 3.

Any other pending motions are DENIED AS MOOT.

This case is DISMISSED WITH PREJUDICE.

SO ORDERED.

Signed on  October 12, 2023, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge

26